UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                   Plaintiff,<br>     v.<br><br>JUAN PABLO VILLASENOR-VILLA,<br><br>                  Defendants. | Case No. 1:13-cR-000232-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Pending before the Court is Defendant Juan Pablo Villasenor-Villa's Renewed Motion for Judgment of Acquittal (Dkt. 239). For the reasons explained below, the Court will deny the motion.

## BACKGROUND

On November 4, 2014, a jury found defendant Juan Pablo Villasenor-Villa guilty of various crimes relating to the manufacture and distribution of marijuana, including the crime of engaging in a continuing criminal enterprise (CCE), in violation of 21 U.S.C. § 848. Villasenor-Villa asks this Court to acquit him on the CCE charge.

At trial, there was ample, unrefuted evidence that Villasenor-Villa was involved in growing marijuana on two different sites in the Boise National Forest. One of the sites

was near Rabbit Creek; the other was near Little Beaver Creek.  Villasenor-Villa lived in Caldwell, Idaho, and made several short visits to drop points near these sites.  He ferried workers and supplies to the drop points.

Law enforcement officials raided both sites in September 2013, and arrested various workers found in the Rabbit Creek site.  The Little Beaver Creek site was deserted when law enforcement officials entered the site.  Later, the government found approximately 347 pounds (157.27 kilograms) of marijuana in two different Caldwell homes – Villasenor-Villa's home, and his relative's home.  The evidence also established that Villasenor-Villa sold marijuana to least one other person, Marco Pantoja.

Villasenor-Villa did not challenge this evidence at trial.  In fact, during opening statements, Villasenor-Villa's counsel conceded that his client was guilty of (1) manufacturing marijuana at both grow sites; (2) possessing with intent to distribute at least 100 kilograms of marijuana; and (3) damaging government property.  Villasenor-Villa did, however, challenge three of the seven counts contained in the indictment:  two firearm charges and the CCE charge.  The jury acquitted Villasenor-Villa on the firearm charges, but convicted him on the CCE charge.  Villasenor-Villa says that the conviction on the CCE charge cannot stand because the evidence does not support a finding that he organized, supervised, or otherwise managed five or more other persons.  *See* 21 U.S.C. § 848(c)(1)(A).

## THE LEGAL STANDARD

Villasenor-Villa moves for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c)(1).  Such a motion is reviewed on "a sufficiency-of-the-evidence

standard." *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) (citation omitted). Under this standard, the evidence supports a conviction, if, "viewed in the light most favorable to the government, it would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id*.

## ANALYSIS

"In order to prove a continuing criminal enterprise, the government must show that (1) the defendant's conduct constituted a felony violation of federal narcotics laws; (2) the described conduct occurred as part of a continuing series of violations; (3) the defendant undertook the activity in concert with five or more persons; (4) the defendant acted as the organizer, supervisor or manager of the criminal enterprise; and (5) the defendant obtained substantial income or resources from the purported enterprise." *United States v. Garcia*, 988 F.2d 965, 967 (9th Cir. 1993); *see also* 21 U.S.C. § 848(c).

In finding Villasenor-Villa guilty of this crime, the jury returned a verdict which specifically found that Villasenor-Villa managed, supervised, or organized seven persons: (1) Marcos Solano-Farias; (2) Jose Misael Ayala-Talavera; (3) Gilberto Duran-Contreras; (4) Carlos Cerda-Carpio; (5) Marco Pantoja; (6) Mariah Villasenor-Villa; and (7) "Martin," whose last name is unknown. For purposes of this motion, Villasenor-Villa assumed that the evidence was sufficient to support a finding that he was in a position of management over *four* people: Solano-Farias; Ayala-Talavera; Cerda-Carpio; and Villasenor-Rodriguez). *Mot. Mem.,* Dkt. 240, at 2. He says that the evidence does not support such a finding, however, for the remaining three: Duran-Contreras; Martin; and Pantoja. The Court agrees with the defendant as to Pantoja; there was insufficient

MEMORANDUM DECISION AND ORDER - 3

evidence to support a finding that Villasenor-Villa occupied a management position over him. But substantial evidence supports the jury's finding that the Villasenor-Villa occupied a management position over the other two. As a result, the evidence ultimately supports a finding that Villasenor-Villa managed six other people, which is one more than necessary to be convicted on the CCE charge.

1.  **Gilberto Duran-Contreras**

Turning first to Duran-Contreras, there is sufficient evidence to support a finding that he worked at the Beaver Creek grow. A surveillance camera located at the Little Beaver Creek drop point snapped a photograph of Duran-Contreras when Villasenor-Villa was making a delivery to that site. *See Trial Ex.* 1196. Additionally, four days after the government takedown of the Little Beaver Creek site, Duran-Contreras appeared in Lowman, Idaho – which is relatively near the Little Beaver Creek grow area. *Excerpts from Jury Trial ("Transcript"),* Dkt. 267, at 11:7 to 13:5. He was dirty, "dressed in camouflage, top and bottom," and on foot. *Id.* at 12:22-23. He was looking for a place to stay.

More generally, there was ample evidence from which a jury could infer that Villasenor-Villa was in charge of the Little Beaver Creek grow and, further, that he occupied a position of management over workers present in the Beaver Creek grow, including Duran-Contreras. As noted above, Villasenor-Villa delivered workers and supplies to the site. He drove to an area near the Little Beaver Creek grow immediately after the Rabbit Creek site was raided. He had large of amounts of marijuana in his possession in Caldwell. These facts, viewed in the light most favorable to the

government, support a finding that Villasenor-Villa was on a higher organizational level than were the workers in the site, and that he occupied a management position with respect to the workers.

Despite this evidence, Villasenor-Villa argues that there is "no evidence of what, if any, relationship existed between [Duran-Contreras] and Villasenor-Villa." *Mot. Mem.*, Dkt. 240, at 2. As already discussed above, however, there was ample evidence from which a rational juror could infer that Villasenor-Villa was managing workers at the Little Beaver Creek grow site, including Duran-Contreras. *Cf. United States v. King*, 169 F.3d 1035, 1042 (6th Cir. 1999) ("the supervisor does not have to have personal contact with these individuals [i.e., the supervisees] as long as there is evidence that the individuals were involved with the supervisor in some fashion").

**2.     Martin**

The evidence is also sufficient to support a finding that Villasenor-Villa managed the individual known as "Martin."

At trial, Solano-Farias, a worker at the Rabbit Creek grow, testified that an individual named "Martin" worked at the Rabbit Creek grow as well. Solano-Farias indicated that Martin was in charge of the grow activity at that site, and that he would contact Villasenor-Villa by cell phone to tell him what supplies were needed. And as noted above, Villasenor-Villa brought supplies to the Rabbit Creek drop point.

More generally, there was sufficient evidence from which a rational juror could conclude that Villasenor-Villa occupied a management position over workers who were cultivating and caring for the marijuana plants at the Rabbit Creek grow. As already

noted, he brought workers and supplies to the site, and he ultimately was in possession of large quantities of harvested marijuana. Based on this evidence, a rational juror could conclude that Villasenor-Villa was an "organizer, supervisor or manager" of the various individuals present at the Rabbit Creek grow site, including Martin.

### 3. Marco Pantoja

Finally, as to Marco Pantoja, substantial evidence does not support a finding that Villasenor-Villa occupied a management position over him.

Pantoja was not involved in the marijuana grows in the Boise National Forest. Rather, Villasenor-Villa supplied marijuana to Pantoja, which Pantoja then sold to at least one other person. Specifically, the evidence established that on June 4, June 24, and July 30, 2013, Pantoja sold marijuana to "Justin."[1] There was no evidence that Villasenor-Villa had any direct dealings with Justin. Justin was one of Pantoja's friends, but he had been arrested for possession of marijuana and subsequently agreed to work as a confidential informant for the government. He informed that government that his source was Pantoja, and that someone known as "Pac" was Pantoja's source. *Transcript,* Dkt. 267, at 4:10-19 & 5:19 to 6:25. Pac turned out to be Villasenor-Villa.

In any event, when Marco sold marijuana to Justin on those three days in June and July of 2013, law enforcement officials were watching and listening to each transaction. At trial, these officials testified that each drug sale played out the same way: (1) Justin told Pantoja he needed drugs and arranged to meet Pantoja at Pantoja's house; (2) after he arrived at Pantoja's house, Villasenor-Villa drove up; (3) Pantoja took Justin's money

---

[1] Justin was referred to during the trial only by first name.

(marked bills supplied by the government) and got into Villasenor car; (4) a few minutes later, Justin would emerge with a pound of marijuana for Justin.

The government argues that this method of sale, combined with the fact that Pantoja did not cut, alter, or repackage the marijuana he got from Villasenor-Villa, establishes that Villasenor-Villa was directing, managing, or supervising Pantoja's sales to Justin.

The Court is not persuaded. The supervisory element of section 848(c) is not satisfied by a mere buyer-seller relationship. *See United States v. Delgado*, 4 F.3d 780, 785 (9th Cir. 1993). As the Ninth Circuit has explained, "selling [drugs] to people does not make one an organizer of customers, even wholesale customers, any more than buying from them makes one an organizer of suppliers." *Id.* The evidence here plainly shows a buyer-seller relationship between Pantoja and Villasenor-Villa, but it does not show that Villasenor was somehow controlling Pantoja's downstream sale to Justin, or that he was otherwise supervising, managing, or directing Pantoja.

The government attempts to bolster its argument by asserting that "Detective Garcia . . . testified that the drug debts incurred by 'Justin' were not owed to Marcos Pantoja, but to Villasenor-Villa." *Response,* Dkt. 254, at 7. But the Detective Garcia did not so testify. Rather, Justin offered the following testimony regarding the drug debt:

(1) His source was Pantoja. *Transcript,* Dkt. 267, at 3:7 to 6:25.

(2) He owed a drug debt of "a couple thousand dollars" because someone – he did not specifically say who – had "fronted" drugs to him. *Id.* at 7:20 to 8:18.

(Fronting means that Justin got the drugs on credit, with an obligation to pay later. *See id.*)

(3) He said his source wanted to see him "fulfill" this debt. *Id.* at 8:16-18.

(4) He knew that someone nicknamed "Pac" supplied Pantoja with marijuana, but he never knew who Pac actually was. *See id.* at 6:17-25 & 9:8-12.

Additionally, in testifying about one of the controlled buys between Justin and Pantoja, DEA Special Agent Aldine testified that the government included extra money for "the debt that the CS – the CI [i.e., Justin] *owed to Pantoja.*" *Id.* at 10:1-6 (emphasis added). In light of this evidence, a rational juror could not feasibly conclude that Justin owed money directly to Villasenor-Villa, as the government has argued.

Finally, the government says that on at least one occasion, Pantoja turned over *all* the money he received from Justin to Villasenor-Villa. The government argues that this fact supports the notion that Pantoja was selling Villasenor-Villa's marijuana to Justin, rather than making his own independent sale. In an effort to establish that Pantoja turned over his entire proceeds to Villasenor-Villa, the government points out that when Villasenor-Villa's wife was arrested, she had $2,900 cash in her possession, which matched up with $2,900 of marked bills the government had given to Justin for the June 24, 2013 transaction.[2] *See Response,* Dkt. 254, at 7.

The evidence doesn't line up with this argument, however. First, the $2,900 in marked bills Villasenor-Villa's wife had in her possession matches up with marked bills

---

[2] During opening statements, the government indicated Justin was given $2,900 for the June 4 transaction ($2,500 for the marijuana, plus $400 for his debt). But the evidence established that Justin was given $2,700 in cash for the June 4 transaction – not $2,900. *See Transcript,* Dkt. 267, at 5:11-14.

given to Justin for the July 30 transaction – not the June 24 transaction. *See Id.* at 13:10-24; *Government's Amended Trial Exhibit,* Dkt. 218 (describing Exhibit 1071 as an "[e]nvelope with buy cash from Victoria Secret bag that matches controlled buy funds on 7/30/13"). Second, the government supplied Justin with $3,000 – not $2,900 – for the July 30 transaction. *See Id.* at 13:10-24; *Trial Ex.* 1072. The Court is thus not persuaded by this aspect of the government's argument.

More broadly, for all the reasons explained above, the Court is generally not persuaded that substantial evidence supports a finding that Villasenor-Villa occupied a management position over Pantoja. Despite this ruling, however, the jury's verdict on the CCE charge will stand because substantial evidence supports a finding that Villasenor-Villa occupied a management position with respect to six other individuals.

## ORDER

Defendant Juan Pablo Villasenor-Villa's Renewed Motion for a Judgment of Acquittal (Dkt. 239) is **DENIED**.

DATED: January 21, 2015

B. Lynn Winmill
Chief Judge
United States District Court